UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL GOLDBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-01557-RLY-MPB |
| | ) | |
| KEVIN JUNION and BILLY GLENN, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Paul Goldberg, was at his home in Indianapolis on July 25, 2013 when two men in civilian clothes knocked on his front door. Plaintiff partially opened his door and stood in the doorway to speak with the men. Defendants, Detectives Kevin Junior[1] and Billy Glenn, explained that they were real estate investors interested in purchasing his home. When Plaintiff said his home was not for sale, Defendants revealed that they were actually police officers who were investigating him based upon probable cause that he was growing marijuana in his home. The officers asked to come inside the home so as to look around, but Plaintiff refused, noting that they could come in once they obtained a search warrant. Plaintiff stepped out of the doorway (back into the interior of the home) and attempted to shut his door. But the door would not shut; one of the officers had put his foot in the doorway. Defendants then forced the door open, entered the home, and arrested Plaintiff.

---

[1] Detective Junior is misnamed in the case caption as Kevin Junion.

Plaintiff subsequently filed this suit, alleging false arrest, illegal search, illegal entry, and excessive force.  Defendants now move for summary judgment on the false arrest, illegal search, and illegal entry claims, arguing that they are entitled to qualified immunity.  Plaintiff does not oppose summary judgment on the illegal search claim. Additionally, the court finds that because Defendants had at least arguable probable cause to arrest Plaintiff, they are entitled to qualified immunity for the false arrest claim. However, they are not entitled to qualified immunity for the illegal entry claim. Accordingly, the court **GRANTS IN PART** Defendants' motion.

**I. Facts[2]**

On July 23, 2013, an anonymous citizen e-mailed a tip to Crime Stoppers of Central Indiana, providing information about a marijuana growing and dealing operation at the residential duplex located at 3323 and 3321 Boulevard Place in Indianapolis, Indiana.  (Filing No. 36-2, Crime Stoppers Tip).  The tip was unusual in that it was "a lot more detailed" than most tips.  (Filing No. 36-3, Deposition of Detective Kevin Junior 15:4-9).  The tipster wrote the duplex was owned by a Caucasian male named Paul Goldberg who was 46 years old, 6' 4" tall, weighed 250 pounds, had a shaved or bald head, and drove a white, Chevrolet full sized cargo van.  (Crime Stoppers Tip). According to the tip, Plaintiff: (1) had at least 100 live marijuana plants growing in the

---

[2] Defendants initially state that they accept Plaintiff's version of the facts for purposes of summary judgment in their opening brief, (*see* Filing No. 37 at 1 n.1; S.D. Ind. L.R. 56-1(g)), but then go on to include facts that Plaintiff vigorously disputes (e.g., that the officers told him not to go back inside his home).  The court holds Defendants to their stipulation and does not consider any facts in their brief that are disputed by Plaintiff.

basements of both sides of the duplex, (2) sold the bulk of his marijuana to a person named Jacob Sacks, (3) generally had customers pick up their marijuana at his house, but would sometimes deliver, (4) had a digital scale, (5) sold anything from a few grams to a pound or two of marijuana, and (6) had a knife but no guns. (*Id.*). The tip also explained that the scent of marijuana permeated from the house and was particularly noticeable at the back window of the unit at 3321. (*Id.*).

The tip was forwarded to Narcotics Detective Kevin Junior with the Indianapolis Metropolitan Police Department ("IMPD") for investigation. (Junior Dep. 11:21-12:20). As part of his investigation, Detective Junior checked the Marion County Assessor's website to see who was listed as the owner of the property at 3323 and 3321 Boulevard Place, and it showed Plaintiff's name. (*Id.* 18:10-14; Filing No. 36-4, Probable Cause Affidavit ("PC Aff.") at 1). Detective Junior also obtained the photograph associated with Plaintiff's driver's license from the Indiana Department of Motor Vehicles, so that he would recognize Plaintiff if he saw him. (Junior Dep. 28:3-7).

On either July 23 or July 24, 2013, Detective Junior drove to the duplex to conduct surveillance. (*Id.* 15:11-16:7, 20:25-21:3). While there are two separate units, both units share a common porch. (*Id.* 25:21-22). Detective Junior observed that the south unit appeared to be vacant, but that the north unit appeared to be lived in. (PC Aff. at 1). Based on his training and experience as a narcotics detective, he knew that it is common for marijuana growers to use an empty residence for their grow operations because marijuana grow operations use a lot of electricity, and high electricity use, as evidenced by a high electric utility bill, can tip off law enforcement. (*Id.* at 2). Consequently, it

appeared to him that the south unit could be being used in connection with a marijuana grow operation. (*Id.*). While conducting surveillance, he saw a white van leave the residence. (Junior Dep. 16:10). He also talked to a neighbor who confirmed that the man who owned the duplex was named "Paul." (*Id.* 17:11-25). Detective Junior then walked down a common walkway on the south side of Plaintiff's property and smelled raw marijuana. (*Id.* 19:5-23).

On July 25, 2013, Detective Junior returned to Plaintiff's neighborhood with fellow IMPD Narcotics Detectives Billy Glenn and Gary Riggs. (*Id.* 21:20-23; PC Aff. at 1). Detective Riggs stayed in his car so that Plaintiff would not feel intimidated by so many people on his porch, and to be available in the event that Detectives Junior and Glenn needed help. (Junior Dep. 24:21-25:8). As soon as Detectives Junior and Glenn got out of their car and began walking towards Plaintiff's duplex, they could smell fresh marijuana. (*Id.* 25:14-18). The smell got stronger as they got closer to the duplex. (*Id.* 25:19-20). When they stepped onto the porch on the south side of the duplex, Detective Junior concluded that there "should be a large sum of fresh marijuana in the south side of the [duplex] because of how strong the smell was." (*Id.* 26:2-5). They then walked to the north side of the duplex, the unit in which they believed Plaintiff lived. (*Id.* 27:18-19). As they stood in front of the door to the north unit, they could smell burning marijuana coming from behind the door. (*Id.* 27:19-21).

Detective Junior knocked on the door, and Plaintiff answered. (*Id.* 28:9-11). Plaintiff stood in front of the door, which opens inward, "in the frame of the door on the threshold" (i.e., "in the doorway"). (Filing No. 36-5, Dep. of Plaintiff 12:6-10, 13:22-

14:8, 14:25-15:1).  When Plaintiff opened the door, the detectives smelled burning marijuana coming from inside the house.  (Junior Dep. 28:14-18).

Detectives Junior and Glenn were dressed in plain clothes.  (Plaintiff Dep. 12:10-18).  They told Plaintiff that they were investors interested in buying his property, and they asked if they could take a look inside.  (*Id.* 12:24-13:13).  After he told them that the property was not for sale, the detectives then revealed themselves to be law enforcement and one of them quickly flashed his badge, which did not allow Plaintiff an opportunity to see it well.  (*Id.* 13:9-21, 15:10-16:4).  The detectives said, "The game's up.  We're the police.  We smell burning marijuana, and we need to take a look inside."  (*Id.* 15:10-13).  The detectives asked Plaintiff if he would consent to a search of his home.  (*Id.* 16:10-17:1).  He told the detectives that they would need to get a search warrant, at which point Defendants said his house was being put on "lockdown."  (*Id.* 16:15-19, 17:18-19).

Plaintiff then "turned around to go back inside because [he] was pretty much done with the conversation."  (*Id.* 18:10-11).  Because he was "on the outside of the door," he had to take "one step back" to go "back into the house."  (*Id.* 18:24-19:5).  (*See* Filing No. 42-3, Declaration of Plaintiff ¶ 8 ("I then stepped back from the doorway into the house . . . .")).  The officers never told him not to go inside.  (*Id.* ¶ 13).  Additionally, up to this point, the officers had not touched him or told him he was under arrest.  (*Id.* ¶¶ 9, 14).

Plaintiff got behind the door and tried to close it, but the door would not shut because one of the detectives had put his foot on the threshold between the door and the frame.  (Plaintiff Dep. 19:8-20:11).  Then "[t]he door crashed in" and Plaintiff "was hit

with something in the face." (*Id.* 20:13-19). Plaintiff testified that it "felt like a fist in [his] face," but that it might have been the door. (*Id.* 20:21-21:1). The impact caused him to spin, stumble, and fall facedown onto a couch that was situated just inside the door. (*Id.* 21:3-22:5, 24:6-11). As he lay on the couch, he felt knees on his back, and then one of the detectives wrapped an arm around his neck and began to choke him. (*Id.* 22:6-23:3). The detectives yelled, "Stop resisting," but he was not resisting. (*Id.* 23:14-17). Plaintiff felt as if "all the air came out of [his] lungs" and that he was on the verge of losing consciousness. (*Id.* 24:24-25, 25:18). Eventually, the detectives sat him up on the couch and placed him in handcuffs. (*Id.* 26:20-22).

After Plaintiff was secured in handcuffs, Detective Junior, and possibly Detective Riggs as well, then conducted a protective sweep of the house. (*Id.* 28:13-15; Junior Dep. 42:14-17). During the protective sweep, Detective Junior saw trays of dried marijuana, live marijuana plants, and drug paraphernalia all over the house in plain view. (Filing No. 36-6, Affidavit of Detective Junior ¶ 22; *see* Filing No. 44-1, Exhibits F (marijuana cigarette), G (trays of dried marijuana), I, J, K, L (marijuana plants, grow lights, fans, filters, and thermometer), and N (plastic baggies)). Detective Glenn and Detective Riggs, who by that time had left his car and come to assist, stayed at the house with Plaintiff while Detective Junior went to apply for a search warrant. (Junior Aff. ¶ 16).

A judge issued a search warrant. (Filing No. 36-7, Search Warrant). The Indiana State Police drug eradication team came and searched the property. (Junior Dep. 49:18-21).

On July 26, 2013, Plaintiff was charged with dealing in marijuana, possession of marijuana, maintaining a common nuisance, and resisting law enforcement. *See State of Indiana v. Goldberg*, No. 49G14-1307-FD-048773 (Marion Super. Ct. 2014). All charges were dismissed on April 29, 2014. *Id.*

## II. Legal Standard

"Summary judgment is proper where, construing facts and drawing inferences in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Novoselsky v. Brown*, 822 F.3d 342, 348-49 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

## III. Discussion

The court construes Plaintiff's Complaint as advancing four counts: (1) false arrest, (2) illegal search, (3) illegal entry, and (4) excessive force. Defendants move for summary judgment on only the first three counts. Plaintiff did not respond to Defendants' arguments regarding the illegal search claim, and has therefore abandoned the claim. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Summary judgment for Defendants shall be granted on Count 2.

The only issues remaining before the court are whether Detectives Junior and Glenn are personally liable for violating Plaintiff's Fourth Amendment rights when they allegedly arrested him without probable cause and entered his home without consent or a warrant. Defendants contend summary judgment in their favor is required because they are entitled to qualified immunity.

## A. Qualified Immunity Standard

Qualified immunity is a "powerful shield," *Gregorich v. Lund*, 54 F.3d 410, 413 (7th Cir. 1995), that insulates "federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The Supreme Court has stressed that this doctrine "is designed to protect 'all but the plainly incompetent or those who knowingly violate the law.'"  *Morse v. Frederick*, 551 U.S. 393, 429 (2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).  Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

## B. False Arrest Claim

To prevail on this claim, Plaintiff must show that there was no probable cause for his arrest.  *Brooks v. City of Chi.*, 564 F.3d 830, 832 (7th Cir. 2009).  "The existence of

probable cause is therefore an absolute defense to a § 1983 claim for false arrest."

*Hurem v. Tavares*, 793 F.3d 742, 745 (7th Cir. 2015).  Probable cause to arrest "exists

when a reasonable person confronted with the sum total of the facts known to the officer

at the time of the arrest would conclude that the person arrested has committed, is

committing, or is about to commit a crime."  *Venson v. Altamirano*, 749 F.3d 641, 649

(7th Cir. 2014).  This is a "practical, commonsense" concept; probable cause "requires

something more than a hunch," but it "does not require a finding that it was more likely

than not that the arrestee was engaged in criminal activity."  *Abbott v. Sangamon Cty.*,

705 F.3d 706, 714 (7th Cir. 2013).  At bottom, "the officer's belief that the arrestee was

committing a crime need only be reasonable."  *Id.*

For qualified immunity to attach, Defendants need not show they had actual

probable cause though.  Rather, they need only show that they had "arguable probable

cause."  *Bruce v. Guernsey*, 777 F.3d 872, 878 (7th Cir. 2015).  Thus, even if the

detectives did not have probable cause to arrest Plaintiff, they are "entitled to qualified

immunity if 'a reasonable officer could have mistakenly believed that probable cause

existed.'"  *Burritt v. Ditlefsen*, 807 F.3d 239, 250 (7th Cir. 2015) (quoting *Fleming v.*

*Livingston Cty.*, 674 F.3d 874, 880 (7th Cir. 2012)).  Paraphrasing the *Fleming* court, as

long as the officers reasonably, albeit possibly mistakenly, believed that they had

probable cause to arrest Plaintiff, then they must be shielded from personal liability.  674

F.3d at 880.

Defendants argue that they had probable cause to arrest Plaintiff for both

possessing marijuana and dealing in marijuana.  Plaintiff argues just the opposite, and

further contends that much of the evidence cited by Defendants must be excluded from the court's analysis because it was acquired after he was seized. As Plaintiff rightly notes, "the probable cause determination is made at the moment the arrest is made. Any evidence, therefore, that came to light after the arrest is not relevant to the probable cause inquiry." *Maltby v. Winston*, 36 F.3d 548, 557 (7th Cir. 1994) (citations and quotation marks omitted). Plaintiff maintains that he was seized when the officers crashed through his front door, and therefore any evidence acquired after that moment (such as the 112 live marijuana plants and the trays of dried marijuana) cannot be considered.

Even assuming Plaintiff is correct, there can be no question that the officers had at least arguable probable cause to arrest him for possessing marijuana prior to entering his home. Pursuant to Indiana law,

> A person who: (1) knowingly or intentionally possesses (pure or adulterated) marijuana, hash oil, hashish, or salvia; (2) knowingly or intentionally grows or cultivates marijuana; or (3) knowing that marijuana is growing on the person's premises, fails to destroy the marijuana plants; commits possession of marijuana, hash oil, hashish, or salvia, a Class B misdemeanor . . . .

Ind. Code § 35-48-4-11(a). *See Abbott*, 705 F.3d at 715 ("The existence of probable cause or arguable probable cause depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law."). The officers believed that they had probable cause based upon: (1) the highly detailed tip made to the Crime Stoppers website; (2) their independent confirmation of certain information contained in the tip, including Plaintiff's ownership of the property, the apparently vacant south side of the duplex, and the white van leaving the property; (3) the scent of fresh marijuana coming

from Plaintiff's duplex on two different occasions; and (4) the scent of burning marijuana coming from inside Plaintiff's home.

Plaintiff attempts to mitigate these facts by emphasizing: (1) the detectives did not actually witness him possessing marijuana; (2) they could not be sure that the odor came from his house rather than being blown from a neighboring house; and (3) they could not be sure that he was the person who smoked marijuana in the house. In making these arguments, Plaintiff ignores that "probable cause deals not with hard certainties but with probabilities." *Abbott*, 705 F.3d at 714. Moreover, "a finding of probable cause does not require evidence sufficient to satisfy 'a reasonable-doubt or even a preponderance standard.'" *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)).

Assuming, *arguendo*, that the officers did not have actual probable cause to arrest Plaintiff for possessing marijuana, a reasonable officer confronted with this evidence could have mistakenly believed that probable cause existed. Therefore, Defendants are entitled to qualified immunity on Plaintiff's false arrest claim. Summary judgment for Defendants is required.

## C. Illegal Entry Claim

It is well established that law enforcement "may constitutionally arrest an individual in a public place (e.g., outside) without a warrant, if they have probable cause." *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001) (citing *United States v. Watson*, 423 U.S. 411, 417-24 (1976)). However, even with probable cause, an officer "may not constitutionally enter a home without a warrant to effectuate

11

an arrest, absent consent or exigent circumstances." *Id.* (citing *Payton v. New York*, 445 U.S. 573, 585-90 (1980)). As the Supreme Court noted, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). Warrantless entry into a home is *per se* unreasonable under the Fourth Amendment, unless one of the "specifically established and well-delineated exceptions" applies. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

Defendants argue that exigent circumstances, one of the established exceptions, applies in this case. This exception may only be invoked "when there is a pressing need for the police to enter but no time for them to secure a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014) (citing *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). The officers raise three specific exigencies expressly recognized by the Seventh Circuit in *Sutterfield*: (1) "when police are in 'hot pursuit' of a fleeing suspect", (2) "to prevent imminent destruction of evidence," and (3) "when there is a danger posed to others by the occupant of a dwelling." *Id.*

### 1. Hot Pursuit of a Fleeing Suspect

First, Defendants argue that they were entitled to enter Plaintiff's home because they were in "hot pursuit" of a fleeing suspect (specifically, Plaintiff). In support of this position, Defendants rely on the Supreme Court's decision in *United States v. Santana*, 427 U.S. 38 (1976). In *Santana*, law enforcement had probable cause to arrest the defendant for drug crimes. *Id.* at 40, 42. As they were approaching the defendant's home, officers noticed that she was standing in the doorway. They "pulled up within 15

12

feet" of the defendant, got out of the vehicle, shouted "police," and displayed their identification. *Id.* at 40. The defendant immediately fled inside her home. The police followed through the open door and arrested her. *Id.*

The defendant moved to suppress evidence found during and after her arrest, arguing that the officers had illegally entered her home. *Id.* at 41. The Supreme Court disagreed and held that the defendant "was in a 'public' place" when the police arrived. *Id.* at 42. By standing in her doorway, "[s]he was not in an area where she had any expectation of privacy. . . . She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* The Court went on to hold, "a suspect may not defeat an arrest which has been set in motion in a public place . . . by . . . escaping to a private place." *Id.* at 43. The entry was therefore justified by the "hot pursuit" of a fleeing felon exigency. *Id.*

Applying the rule from *Santana*, Defendants assert that, because Plaintiff was standing in the doorway to his home during the entire encounter, he was in public when they initiated his arrest. [3] Plaintiff was not allowed to "thwart an otherwise proper arrest"

---

[3] Defendants actually advance this theory as an argument in the alternative. They primarily argue that Plaintiff had completely exited his home by highlighting certain portions of his deposition testimony. As noted above, Plaintiff testified that, during his talk with the officers, he stood in front of his door, which opens inward, "in the frame of the door on the threshold" (i.e., "in the doorway"). (Plaintiff Dep. 12:6-10, 13:22-14:8, 14:25-15:1). Once he decided to end the conversation, he had to take "one step back" to go "back into the house" because he was "on the outside of the door." (*Id.* 18:24-19:5). Defendants reason that if Plaintiff had to turn around and step back into the house, he must have been outside the home during the encounter. In doing so, Defendants take Plaintiff's words out of context and misconstrue an unambiguous narrative. When a door opens inwards, a person standing in the doorway cannot close the door until he steps back into the interior of the home. Plaintiff's testimony is not inconsistent or contradictory; he was standing in his doorway.

by "retreating in h[is] house." *Id.* at 42. Thus, when he attempted to go back inside the home, the officers were lawfully entitled to pursue him as a fleeing suspect.

Plaintiff distinguishes *Santana*, and asserts that this case is more akin to *United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1991). In *Berkowitz*, law enforcement had probable cause to arrest the defendant for stealing government property. *Id.* at 1378, 1380. Internal Revenue Service agents knocked on the defendant's door, and he opened the door to answer. *Id.* at 1380. There was a dispute of fact as to what happened next. According to one of the agents, after the defendant opened the door, the agent immediately told him that he was under arrest. The defendant did not resist or attempt to close the door. The agents consequently entered the home to complete the arrest. According to the defendant, immediately after he opened the door, an agent stepped inside the home and then told him that he was under arrest. *Id.*

The Seventh Circuit concluded that if the agents were to be believed, there was no Fourth Amendment violation: "When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent." *Id.* at 1387.

If, however, the defendant was to be believed, there was a Fourth Amendment violation. The court explained, "A person does not abandon this privacy interest in his home by opening his door from within to answer a knock. Answering a knock at the door is not an invitation to come in the house." *Id. See Sparing*, 266 F.3d at 690 (same). *See also Kentucky v. King*, 563 U.S. 452, 470 (2011) ("[E]ven if an occupant chooses to open

14

the door and speak with [law enforcement officers who do not have a warrant], the

occupant need not allow the officers to enter the premises and may refuse to answer any

questions at any time."). The court went on to distinguish *Santana*:

> As far as reasonable privacy expectations go, there is a significant difference
> between a person who for no reason voluntarily decides to stand in his open
> doorway, and a person who merely answers a knock on his door. The person
> who answers the knock and stays within the house is not voluntarily exposing
> himself "to public view, speech, hearing, and touch as if [he is] standing
> completely outside [his] house."

*Berkowitz*, 927 F.2d at 1388 (quoting *Santana*, 427 U.S. at 42) (alteration in *Berkowitz*).

The court agrees with Plaintiff that *Santana* is inapplicable to this case. Unlike the

defendant in *Santana*, Plaintiff was not standing in his open doorway before speaking

with the officers. Rather, he opened his door *in response to* the officers' knock.

*Berkowitz* makes clear that this distinction is significant, as it means Plaintiff was not in

public during the encounter. *Id. See United States v. Xiong*, 60 F. Supp. 2d 903, 909

(E.D. Wis. 1999) ("[W]hen police knock or otherwise act to induce defendant to open the

door, the open threshold is not instantly converted into a public place. This is especially

true when the inducement has been an affirmative misrepresentation by police as to their

identity."). Thus, Plaintiff was inside his home, a private space, when he spoke with the

detectives.

Since Defendants did not have a search warrant, Plaintiff retained the "right to

close the door on the unwanted visitors." *Berkowitz*, 927 F.2d at 1387. As a fellow

district court explained,

> It does make perfect sense to allow officers to finish the job and complete a
> valid doorway arrest by chasing the arrestee inside if he tries to run. But if

15

officers start an invalid doorway arrest, then further Fourth Amendment intrusions into the home cannot be excused by the homeowner's attempt to retreat into the home.

*Flores v. Lackage*, 938 F. Supp. 2d 759, 771-72 (N.D. Ill. 2013).  Therefore, this exigency does not support Defendants' warrantless entry into Plaintiff's home.

## 2. Imminent Destruction of Evidence

Second, Defendants advance a one-sentence, perfunctory argument that they were justified in entering the home without a warrant because they had a realistic expectation that, if they left to get a warrant, Plaintiff would have taken steps to destroy evidence. Defendants present no evidence whatsoever to support this position.  Exigent circumstances to enter a residence do not automatically exist simply because officers suspect that individuals within the house might attempt to destroy evidence.  The Seventh Circuit has soundly rejected this type of argument:

> Police who without a warrant knock on the door of a drug house seeking consent to enter take the risk that permission will be withheld and an emergency will not materialize.  Where an occupant turns the police away or asks to see a warrant, the officer cannot, without some other suspicious activity, justify a warrantless entry based solely on the fear that evidence might be destroyed.

*United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) (citation, quotation marks, and brackets omitted).  The court went on to conclude that "an emergency justifying entry and a search arises only if the officer knocking at the door observes objective evidence that there is an ongoing crime within that must be stopped before it is completed."  *Id.* at 734.  Defendants make no attempt to show how they satisfy this standard.  If law enforcement needed to show just a mere possibility that evidence will be destroyed, that

16

"would effectively nullify any requirement of a warrant to search a house.  All the police would need would be probable cause to believe that the house was occupied and contained contraband or evidence of crime."  *United States v. Collins*, 510 F.3d 697, 699 (7th Cir. 2007).

Moreover, Defendants suspected Plaintiff had a sizeable marijuana grow operation in his home.  It would not have been possible for him to destroy the many live plants and heavy equipment required for such an operation in the time it takes to obtain a search warrant.  As Plaintiff quips, a few ounces of dried marijuana can be flushed down a toilet.  Lights and ventilators cannot.  Therefore, this exigency does not support Defendants' warrantless entry into the home.

### 3. Danger to Others

Third, Defendants argue that their warrantless entry into the home was justified based upon their fear that Plaintiff might obtain a weapon from inside and use it against them.  In other words, they were concerned for their safety.  In support, the detectives point to one piece of evidence: the Crime Stoppers Tip, which noted that Plaintiff had a knife.  They essentially claim that if Plaintiff had a knife, it was reasonable for them to think he might have also had a gun or some other dangerous weapon.  Nonsense.  As Plaintiff notes, this is pure speculation on the part of Defendants.  There was no evidence indicating Plaintiff had firearms in his home.  In fact, the Crime Stoppers Tip actually states, "Weapons: I know he has a knife and believe he has no guns."  Additionally, Defendants present no evidence that Plaintiff was violent or threatening during this

encounter.  Therefore, this exigency does not support Defendants' warrantless entry into the home.

### 4. Qualified Immunity Determination

None of the exigent circumstances invoked by Defendants justify their warrantless intrusion into Plaintiff's home.  When Defendants prevented Plaintiff from shutting his door and then forced themselves into his home, they violated his Fourth Amendment "right to be free from physical intrusion into the home by police officers without a warrant seeking to effectuate an arrest." *Sparing*, 266 F.3d at 690.  This right was clearly established by the Seventh Circuit in *Berkowitz* in 1991, and then reaffirmed in *Sparing* in 2001, long before this incident took place in 2013.  Consequently, Defendants are not entitled to qualified immunity for Plaintiff's illegal entry claim.

## IV. Conclusion

Therefore, Defendants' Motion for Partial Summary Judgment (Filing No. 35) is **GRANTED IN PART**.  The motion is granted as to Plaintiff's false arrest and illegal search claims.  The motion is denied as to Plaintiff's illegal entry claim.


**SO ORDERED** this 23rd day of September 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.

18